IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 4, 2025 Session

## STATE OF TENNESSEE v. TONDRE DUPRESS RAGLAND

**Appeal from the Circuit Court for Haywood County**
**No. 7813      Clayburn Peeples, Judge**

_____

### No. W2024-00535-CCA-R3-CD

_____

A Haywood County jury convicted the Defendant, Tondre Dupress Ragland, of attempted second degree murder, possession of a firearm during the commission of a dangerous felony, and aggravated assault. The trial court sentenced the Defendant to an effective sentence of twenty years in confinement. On direct appeal, this court affirmed the Defendant's convictions, but we reversed the imposition of consecutive sentences and remanded to the trial court for consideration of the *Wilkerson* factors. *State v. Ragland*, W2022-01303-CCA-R3-CD, 2023 WL 3947501, at *1 (Tenn. Crim. App. June 12, 2023), *no Tenn. R. App. P. 11 application filed.* On remand, the trial court found that the Defendant was a dangerous offender and again imposed consecutive sentences. On appeal, the Defendant contends that the trial court erred when it found that he was a dangerous offender for purposes of consecutive sentencing. After conducting a *de novo* review, we conclude that the Defendant's sentences should be served concurrently, rather than consecutively.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and MATTHEW J. WILSON, JJ., joined.

M. Todd Ridley, Franklin, Tennessee, for the appellant, Tondre Dupress Ragland.

Jonathan Skrmetti, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Frederick H. Agee, District Attorney General; and Scott G. Kirk, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts
### A. Procedural History

This case arises from the Defendant's firing a gun at a car driven by Carolyn Bonds and then shooting her passenger, Michael White, after he exited the car. A Haywood County grand jury indicted the Defendant for the attempted first degree premeditated murder of Mr. White, use of a firearm during the commission of a dangerous felony, and the aggravated assault of Ms. Bonds. The case proceeded to trial, and the jury convicted the Defendant of attempted second degree murder, a lesser included offense of the attempted first degree murder charge, and, as charged, use of a firearm during the commission of a dangerous felony and aggravated assault. The Defendant appealed, claiming that the evidence was insufficient to support his conviction for aggravated assault and that the trial court erred in imposing partial consecutive sentences based upon the "dangerous offender" classification. T.C.A. § 40-35-115(b)(4). This court affirmed the convictions, but we remanded for a new sentencing hearing for consideration of the consecutive sentencing factors outlined in *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995). *Ragland*, 2023 WL 3947501, at *1

On remand, the trial court again found that the Defendant was a dangerous offender and imposed partial consecutive sentencing. The Defendant appeals, claiming that the trial court erred when it applied partial consecutive sentencing. We summarize[1] the facts presented at trial, the first sentencing hearing, the trial court's findings as to the dangerous offender classification at the first sentencing hearing, and the trial court's findings at the sentencing hearing on remand.

## A. Trial

On December 21, 2014, at the Defendant's request, the Madison County Sheriff's Department went to Ms. Bonds's residence in Jackson, Tennessee, and told her to return the Defendant's car. According to the Defendant and Mr. White, Ms. Bonds and the Defendant were dating. According to Ms. Bonds, she and the Defendant were "mutual friends." Whatever the relationship might have been, the Defendant allowed Ms. Bonds to borrow his Cadillac DeVille. After she failed to return his car for more than a month, he contacted the Sheriff's Department. After speaking with the Sheriff's deputies, Ms. Bonds spoke with the Defendant and agreed to return the Cadillac to him that day in Haywood County.

Before Ms. Bonds left for Haywood County, she spoke with Mr. White, a distant cousin, and he asked if she would give him a ride to Haywood County. She agreed and the

---

[1] This court may take judicial notice of the court records in an earlier proceeding of the same case. *See State ex rel. Wilkerson v. Bomar*, 376 S.W.2d 451, 453 (Tenn. 1964). In this case, we are asked to take judicial notice of the trial court proceedings relevant to the Defendant's challenge.

two drove to Brownsville. Once they arrived, Ms. Bonds spoke with the Defendant on the phone. According to Mr. White, the Defendant asked who was in the car with Ms. Bonds, and when she told the Defendant, he hung up on her. Mr. White had known the Defendant all his life, and they had never had any issue with one another. Mr. White considered the two men to be friends. After Ms. Bonds unintentionally drove past the Defendant's house, she turned around. As they drove back down Qualls Road, Mr. White and Ms. Bonds saw the Defendant walking down the road toward them. Mr. White described the area where the Defendant lived as "[i]n the country."

Upon reaching the Defendant, Ms. Bonds put the car in park, and the Defendant opened the car door and began hitting Ms. Bonds. Mr. White tried to put his foot on the gas pedal not realizing the car was in park. The Defendant then pulled a gun and said, "You've got the nerve to have this n**ger in my car." The Defendant pointed the gun at Mr. White's head, Mr. White jumped out of the car, and Ms. Bonds drove away. As she drove away, the Defendant fired at the car two or three times. That was the last time that Mr. White saw Ms. Bonds that day. Mr. White began running backward away from the Defendant who then turned his gun toward Mr. White. The Defendant fired his gun, hitting Mr. White in both arms and "across [his] chin." According to Mr. White, the Defendant ran out of bullets, and Mr. White fell into a ditch. From the ditch, Mr. White heard a woman, later identified as Hattie Bell, screaming. Ms. Bell helped Mr. White into her car and drove until she came upon a State Trooper. After speaking with the State Trooper, Ms. Bell followed the State Trooper to a McDonald's restaurant where a helicopter landed and flew Mr. White to the hospital in Memphis.

Mr. White stayed in the hospital overnight and was released the next morning. Medical personnel were concerned that removing the bullet in Mr. White's right arm could cause nerve damage, so they left it. The bullet "worked its way out" about eighteen months later. Mr. White denied having a gun at the time of the incident. He said that he and the Defendant never exchanged a word during this incident and that the Defendant fired his gun at Mr. White four or five times.

On cross-examination, Mr. White admitted that, on the day of the shooting, he had begun drinking alcohol at around 11:00 a.m. Mr. White stated that he did not know why the Defendant was angry with Ms. Bonds. Mr. White maintained that neither he nor the Defendant ever spoke to one another on the day of the shooting. He denied arguing with the Defendant and said that "[w]asn't nobody out there but me and [the Defendant]." He stated "[w]hen [Ms. Bonds] pulled off it wasn't nobody but me, [and the Defendant] standing outside out there. The only people I ever saw was the people that put me off in their car and took me to the helicopter." He confirmed that neither he nor Ms. Bonds ever notified the police about the shooting. Mr. White denied any gang affiliation but admitted that, in a 1990 photograph, he was displaying a Gangster Disciple sign.

3

Ms. Bonds testified similarly to Mr. White but her recollection of the telephone call with the Defendant and the subsequent events was different. She recalled speaking with the Defendant on the phone and that the Defendant told her to "come meet him down the street." The Defendant was walking down the street, and she met him in the roadway. The Defendant opened the car door and "was, you know, hitting, you know - - just hitting," so Mr. White tried to put his foot on the accelerator and Ms. Bonds "drove on off." She said that Mr. White did not exit the car during her interaction with the Defendant but "later on." She recalled that as she drove off, the Defendant pulled her hair. Once they got down the road, Mr. White took his foot off the gas pedal. She then heard "POW-POW." Mr. White told Ms. Bonds to stop so he could figure out "what's going on." She refused to stop, so Mr. White jumped out as Ms. Bonds drove down Qualls Road. When she got to the end of the road, she called Mr. White's cell phone to make sure he was okay. During the phone call, Mr. White said, "I got a ride. Everything okay." The Defendant called her next and said, "Everything was good. They was okay. Everything was good." Later, Mr. White called her again to tell her he had been shot. She said she knew that the Defendant carried a gun with a permit, but she had not seen the gun during their interaction before she drove away.

On cross-examination, Ms. Bonds testified that the Defendant had not taken the gun out until after she drove away because he used both hands to hit her and pull her hair. She confirmed that she never called the police about the incident. She reiterated that she instead called Mr. White to make sure he was okay before she left the area. She denied removing the license tags from the Defendant's car but could not remember if the Cadillac had a license tag when she drove it to Brownsville.

Hattie Bell and her husband had left church when she heard two or three shots. She looked over and saw the Defendant, a neighbor, running behind Mr. White. Mr. White ran toward her car and wanted to get in. The Defendant told Ms. Bell "[d]on't let him in," and then Mr. White fell into a ditch. Ms. Bell got out of her car and told the Defendant "[d]on't shoot him again." She said the Defendant "was respectful" and walked away. Ms. Bell stated that she only saw the Defendant and Mr. White in the area at that time. She did not see a Cadillac DeVille. She helped Mr. White in the car and drove until she saw a State Trooper. She flagged him down and then drove Mr. White to a service station where they waited about an hour before the ambulance arrived.

Gloria Leavy lived two doors down from the Defendant. On December 21, 2014, she looked out her window and noticed two men outside on her driveway. She recognized the Defendant, but she did not know the other man who was leaning up against her car. She stepped outside and saw the men were "passing words" although it was not "heated." The Defendant appeared "calm," but he had a gun. The men walked away from her

4

driveway, and Ms. Leavy went back inside her house.  A few minutes later she heard gunfire.

Haywood County Sheriff's Office ("HCSO") Sergeant Tim Howington, responded to an incident that occurred on Qualls Road.  He met Mr. White at an Exxon at Exit 56 on 76 South.  He arrived at the same time as Emergency Medical Services and spoke with the Bells.  Sergeant Howington never went to Qualls Road.

HCSO Lieutenant Jamie Moore was assigned to investigate this case and also responded to the Exxon.  When he arrived, Mr. White had already been transported to the hospital, so Lieutenant Moore arranged to speak with Mr. White and Ms. Bonds the following day.  Ms. Bonds told Lieutenant Moore that Mr. White pushed the accelerator, and the Defendant "then pulled me by my hair while the car was moving."  After the Defendant let go of Ms. Bonds as she drove away, he pulled his gun and fired at the car.

On cross-examination, Lieutenant Bonds testified that the crime scene on Qualls Road had never been searched because the road was several miles long.  He learned about the location of the shooting the day after the shooting when he met with Mr. White and Ms. Bonds.  He confirmed that neither Ms. Bonds nor Mr. White called 911 following the shooting.

The Defendant testified that when Ms. Bonds refused to return his Cadillac, he contacted the HCSO.  Upon contact with law enforcement, Ms. Bonds agreed to arrange for a "wrecker service" to return the Cadillac to the Defendant.  The Defendant waited outside his cousin's home, but his car never arrived.  At some point, Ms. Bonds called the Defendant and told him she was on Qualls Road.  Seeing his Cadillac drive by, he told Ms. Bonds that she had passed him.  Thirty or forty minutes later, Ms. Bonds returned down Qualls Road.  At this point, the Defendant was walking down the road, and she stopped the Cadillac next to him.  The Defendant reached inside to take the car keys, and Mr. White stepped on the gas.  He explained that he "grabbed [Ms. Bonds's] hair . . . because [his] arm was in the car" when Mr. White accelerated.  As they drove away, Mr. White jumped out of the car.  He clarified that he did not actually see Mr. White jump out of the car, but when the Defendant walked down to his father's house, Mr. White was standing in front of the Defendant's father's house.

As the Defendant approached, Mr. White began "throwing up gang signs" and making threats to the Defendant.  The Defendant saw that his father was not home, so he continued walking.  Mr. White followed him and began making phone calls when they reached Ms. Leavy's yard.  The Defendant did not know to whom Mr. White was speaking but heard him provide his location.  The Defendant knew Mr. White from "school" and the "neighborhood" and was aware that Mr. White may have been a Gangster Disciple.

5

While in Ms. Leavy's yard, the two men began arguing. Ms. Leavy came out of her house, and the Defendant and Mr. White walked away. As they walked, the Defendant called the police department to report Mr. White's threats. Based upon the phone call, he believed an officer was being sent to their location. At the end of the call, Mr. White became angry. He walked in front of the Defendant with his hand in his pocket and said, "MF, I've been in the penitentiary. I'll kill you and go back." The Defendant perceived this as a threat and "feared for [his] life." It was then that he withdrew his gun and fired at Mr. White. The Defendant confirmed that Ms. Bonds was not there during the shooting. He stated that only he and Mr. White were present at the time. After the Defendant shot Mr. White, the Bells drove down the road.

The Defendant explained that after he shot Mr. White, he saw that Mr. White was bleeding, so he ran after Mr. White to keep track of Mr. White until the police arrived and to render aid, if needed. The Defendant denied being angry with Mr. White. He stated that he was upset with Ms. Bonds for failing to return his car, removing the tags off his car, and telling him a wrecker service was bringing his car and then driving it herself.

In reference to his phone call to the police, he stated that law enforcement never came to Qualls Road. He waited until dark for the police to arrive. The next day the police still did not come, and so ultimately, he turned himself in. While the Defendant was incarcerated, a Sheriff's deputy notified him that his Cadillac "had been burned up in [his] yard." The Defendant denied taking out his gun at any point before Mr. White threatened him. The Defendant was unaware of whether Mr. White had a weapon, but he did not see one. The Defendant confirmed that he had a gun carry permit since 1998. He stated that he fired his gun three or four times at Mr. White but never fired his gun at his Cadillac. He testified that he did not run out of ammunition but that he "stopped shooting on my own." The Defendant stated that he had known Ms. Bonds since the early nineties and that they were dating at the time of these events. The Defendant confirmed that he was aware that Ms. Bonds had filed a false police report unrelated to these events. He said it was in relation to her cashing a check, and she served jail time for the offense.

On cross-examination, the Defendant denied any affiliation with a gang. His knowledge with respect to Mr. White's gang affiliation came from living in a small community. He denied that he tried to kill Mr. White, stating, "I didn't try to kill him. If I tried to kill him, you know, you could have did a head shot easy as close as he was to me." He confirmed that he had been trained how to use a gun. The Defendant stated that Ms. Bell "wasn't no where around when [he] shot." He maintained that she arrived "at the end of it." The Defendant recalled that he was running behind Mr. White when Mr. White fell in a ditch. The Defendant caught up to Mr. White and was standing over him when Ms. Bell said, "Baby, have you shot?" The Defendant responded that he had fired his gun

6

at Mr. White, and Ms. Bell said, "[d]on't shoot him no more." The Defendant walked away.

The Defendant denied knowing that Mr. White was in the Cadillac until he walked up to the car on Qualls Road. He maintained that he was not angry with Mr. White or angry that Mr. White was in the Cadillac. He explained that he was angry with Ms. Bonds due to the issues related to his car.

## B. Sentencing

At the sentencing hearing, the State asked the trial court to order the maximum sentence within the range and to impose consecutive sentencing based upon the circumstances of the shooting. The Defendant's attorney noted the Defendant's long-standing employment. He then argued that the Defendant acted under strong provocation because of the lengthy delay in returning his car paired with a possible romantic entanglement with Mr. White's presence in the Defendant's Cadillac. Defense counsel further argued that these were the forty-two-year-old Defendant's first criminal charges.

James Gray testified on the Defendant's behalf. Mr. Gray was the pastor at St. James Church of God in Christ, where the Defendant and Ms. Bell attended church. Mr. Gray stated that the church was not visible from Ms. Leavy's house as it was located a little less than half a mile away. He confirmed that there was "no clear line of sight" from the church or the church parking lot to Ms. Leavy's house. Mr. Gray confirmed that the Defendant had lived on Qualls Road for approximately twenty years and that Mr. Gray had never known the Defendant to cause or be involved in any trouble during that time. Mr. Gray said that the Defendant would often offer help in setting up for church events.

Terrence Byrum had known the Defendant most of his life and testified that the Defendant was not known for causing trouble. He described the Defendant as someone who was always willing to help. The Defendant's sister testified to the Defendant's long work hours. She testified that there were houses on one side of Qualls Road and across the street from the houses was a large, open field. She described the area as rural.

In determining the Defendant's sentence, the trial court applied enhancement factor (5) that the Defendant treated the victim with exceptional cruelty because the Defendant shot the victim more than once. T.C.A. § 40-35-114. The trial court also applied enhancement factor (10) that the Defendant had no hesitation at all about committing a crime when the risk to human life was high because the Defendant fired the gun in "a place where people lived" in addition to the two victims. *Id*. As to mitigating factors, the trial court found that the Defendant did not act under strong provocation. The trial court also found the Defendant's work history, age, and lack of criminal history applicable as

mitigating factors. The trial court imposed a ten-year sentence, to be served at 30%, for the attempted second degree murder conviction, six years, to be served at 100%, for the employing a firearm during the commission of a dangerous felony conviction, and four years, to be served at 30%, for the aggravated assault conviction.

The trial court then considered the criteria for imposing consecutive sentencing. Pursuant to Tennessee Code Annotated section 39-17-1324, the Defendant's sentence for use of a firearm during the commission of a dangerous felony required a mandatory consecutive sentence to the attempted second degree murder conviction. Thus, the only remaining issue for the trial court was whether to run the aggravated assault sentence consecutively to the sixteen-year sentence for an effective twenty-year sentence, or concurrently to the other sentences, for an effective sixteen-year sentence.

After consideration, the trial court found criteria (4) applicable, that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and that he had no hesitation about committing a crime when the risk to human life was high. T.C.A. § 40-35-115 (b)(4). The trial court acknowledged that the Defendant's record did not indicate that he was a dangerous offender; however, "what happened that night indicates that he certainly did not hesitate about committing the crimes that he committed. The circumstances under which he did that were certainly aggravated." The trial court went on to state, "I think confinement for an extended period of time can easily be said to be necessary to protect society." The trial court found that twenty years was not "inconsistent with the crimes committed" and "reasonably relate to the offenses" and imposed consecutive sentencing for a total effective sentence of twenty years.

## C. First Appeal

The Defendant appealed, asserting that the evidence was insufficient to support his aggravated assault conviction and that the trial erred in ordering consecutive sentencing based upon the dangerous offender category.

About the Defendant's challenge to consecutive sentencing, our court stated:

> Although the trial court stated on the record that an extended sentence was necessary to protect the public from further criminal conduct by the defendant and that the length of the defendant's sentence reasonably related to his offenses, it failed to state the specific facts it found to satisfy its conclusion. *See State v. Calloway*, No. M2004-01118-CCA-R3-CD, 2005 WL 1307800, at *13 (Tenn. Crim. App. June 2, 2005) (Woodall, J.) ("We agree with Defendant's contention that the trial court failed to make the specific factual findings required by *Wilkerson* as a prerequisite to finding

that Defendant is a dangerous offender for whom consecutive sentencing is appropriate. The mere recitation of the *Wilkerson* factors is not a substitute for the requirement of making specific findings."); *State v. Scott M. Craig*, No. E2001-01528-CCA-R3-CD, 2002 WL 1972892, at *9 (Tenn. Crim. App. Aug. 27, 2002), *no perm. app. filed* ("A mere statement that confinement is necessary to protect society and that the severity of the sentence is reasonably related to the convicted offenses, without more, is insufficient to justify consecutive sentences [under *Wilkerson*].");  *Wilkerson*, 905 S.W.3d at 938 (holding the trial court must make "specific findings regarding the severity of the offenses and the necessity to protect society before ordering consecutive sentencing under Tenn. Code Ann. § 40-35-115(b)(4)") (emphasis added). Because the trial court failed to make the required findings regarding factor (4), this factor does not support consecutive sentencing. *Pollard*, 432 S.W.3d at 869 ("[W]hen trial courts fail to include the two additional findings before classifying a defendant as a dangerous offender, they have failed to adequately provide reasons on the record to support the imposition of consecutive sentences."). Accordingly, this Court cannot defer to the trial court's exercise of discretion nor presume that the imposition of consecutive sentences was reasonable. *See State v. Carpenter*, No. W2019-01362-CCA-R3-CD, 2020 WL 7040983, at *8 (Tenn. Crim. App. Nov. 30, 2020); *State v. Robinson*, No. W2019-00216-CCA-R3-CD, 2019 WL 6876778, at *7 (Tenn. Crim. App. Dec. 16, 2019).

*Ragland*, 2023 WL 3947501, at *6. This court affirmed the convictions, but we remanded the case for a new sentencing hearing, limited to consideration of the *Wilkerson* factors to determine the propriety of consecutive sentencing in this case.

### D. Findings on Remand

On remand, the trial court held a hearing where the parties presented argument but no further proof. The trial court made the following findings:

All right. I continue to think that consecutive sentences are necessary in this case - - that a consecutive sentence is necessary. The facts show that there were, in fact, two separate victims. That the [D]efendant over an extended time fired shots in a housing area, endangering other people. And I think that is sufficient.

It is from this judgment that the Defendant appeals.

## II. Analysis

9

The Defendant contends that the trial court erred by imposing consecutive sentences. Again, the Defendant asserts that the trial court failed to conduct the prescribed analysis before imposing consecutive sentences and asks this court to conduct a *de novo* review. In response, the State argues that the trial court clearly stated its reasons for ordering consecutive service of the Defendant's sentences and that it did not abuse its discretion in doing so.

A trial court may impose consecutive sentences upon finding by a preponderance of the evidence that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high[.]" T.C.A. § 40-35-115(b)(4). When the imposition of consecutive sentences is based on the trial court's finding the defendant to be a dangerous offender, however, the court must also find "that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." *State v. Wilkerson*, 905 S.W.2d 938, 939 (Tenn. 1995); *see also State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999). Additionally, the effective sentence imposed must be "justly deserved in relation to the seriousness of the offense," and "no greater than that deserved for the offense committed." T.C.A. §§ 40-35-102(1), -103(2); *see State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).

In this case, the trial court did not mention the *Wilkerson* factors on remand. The totality of the review involved the identification of three facts to support the imposition of consecutive sentencing. The trial court noted that there were two victims involved, that the shooting occurred over a period of time, and that others were placed in danger. The trial court did not make any factual findings that support the proposition that the Defendant is a particularly violent individual from whom society needs to be protected. The Defendant had no prior convictions for violent crimes, and the evidence presented at the sentencing hearing established no basis for concluding that a sentence of sixteen years' confinement is not adequate to protect the public from further criminal acts by the Defendant.

When a trial court fails to provide adequate reasons on the record for imposing consecutive sentences, we should neither presume that the consecutive sentences are reasonable nor defer to the trial court's exercise of its discretionary authority. In situations such as these, our supreme court has instructed that the appellate court has two options: (1) conduct a *de novo* review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences. *See Bise*, 380 S.W.3d at 705 & n. 41. Here, because this case has already been remanded to the trial court for consideration of the *Wilkerson* factors in determining the propriety of consecutive sentencing, we will not remand for a second time. Instead, we will conduct a *de novo* review to determine

whether there is an adequate basis for imposing consecutive sentences. *See Pollard*, 432 S.W.3d at 863-64.

While reviewing the trial court's consecutive sentencing decision *de novo*, we keep in mind that the dangerous offender classification "is the most subjective and hardest to apply." *Lane*, 3 S.W.3d at 461. The dangerous offender classification requires a finding that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high[.]" T.C.A. § 40-35-115(b)(4). "'Lack of hesitation' signifies a conscious lack of concern for foreseeable consequences." *Wilkerson*, 905 S.W.2d at 937. The Defendant's conduct in this case demonstrated an indifference to the high probability of calamitous consequences to Ms. Bonds and Mr. White when he fired his gun at the Cadillac while Ms. Bonds was driving away and fired his gun directly at Mr. White. He created a high risk of death or serious bodily injury to Ms. Bonds and Mr. Smith. Arguably, his conduct satisfies the condition stated in Tennessee Code Annotated section 40-35-115(b)(4).

Proof that the Defendant's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender; however, it may not be sufficient to sustain consecutive sentences. Every defendant convicted of two or more dangerous crimes is not a dangerous offender subject to consecutive sentences; consequently, the provisions of section 40-35-115 cannot be read in isolation. Pursuant to *Wilkerson*, the proof must also establish that: (1) the terms imposed are reasonably related to the severity of the offenses committed; and (2) are necessary to protect the public from further criminal acts by the offender. *Wilkerson*, 905 S.W.2d at 939.

Pursuant to *Wilkerson*, we consider whether the terms imposed are reasonably related to the severity of the offenses committed. The jury's verdict of the lesser included offense of attempted second degree murder rather than the offense charged indicates the absence of premeditation by the Defendant. The relationship between the parties, the rural location of the incident, and the resulting injuries are all relevant factors in considering the severity of this offense. Firing a gun at a person is obviously dangerous, but the specific facts and circumstances of this case, including evidence of provocation, support a finding that a concurrent sentence of sixteen years reasonably relates to the severity of the Defendant's offenses.

Next, we consider whether a consecutive sentence is "necessary in order to protect the public from further criminal acts by the offender." *Id.* Based upon the Defendant's age, the absence of a criminal record, and his gainful employment when the offense was committed, consecutive sentencing is not necessary to protect society. In our view, there is no repeated pattern of behavior indicating the Defendant's intent to recommit similar

11

offenses or a pattern of previous failed interventions that demonstrate that the Defendant cannot be rehabilitated and will reoffend. Moreover, these convictions are the first for the Defendant, who was forty-two years old at the time of the crimes. The Defendant had held a gun permit to carry a gun since 1998 without incident. At the time of this offense, the Defendant was gainfully employed and a contributing member of his community. Following the shooting, the Defendant waited for police to arrive and when they did not, he turned himself in. We conclude that consecutive sentences are not necessary to protect the public from the Defendant.

Consistent with the Sentencing Act, we also consider that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. §§ 40-35-102(1), -103(2). Consecutive sentencing in this case would not be the least severe measure necessary to achieve the purposes for which the sentence is imposed. The Defendant was forty-two years old at the time of these offenses, and these were his first criminal offenses. Absent the partial consecutive sentencing, his sentence would be sixteen years, resulting in the Defendant being in his late fifties by the time of his release. With consideration of his lack of criminal history, the severity of the injuries incurred during this incident, and his age, a sixteen-year sentence is a sufficient term to serve for the crimes committed.

Accordingly, although we have concluded that the Defendant's act of firing a gun at Mr. White was clearly "dangerous" conduct, our consideration of the statutory criteria, the *Wilkerson* factors, and the Sentencing Act, leads us to the conclusion that the Defendant should not be classified as a "dangerous offender" for purposes of consecutive sentencing.

## II. Conclusion

Based upon the foregoing reasoning and law, we conclude that the trial court did not properly include, on the record, its reasons for imposing consecutive sentences pursuant to the dangerous offender classification. *See* T.C.A. § 40-35-115(b)(4). Upon *de novo* review of that determination, we conclude that the Defendant cannot properly be classified as a dangerous offender for purposes of consecutive sentencing. We, therefore, reverse the trial court's ruling in this respect. This case is remanded for the entry of judgment forms reflecting that the Defendant's sentence for aggravated assault is to be served concurrently with the sentence for attempted second degree murder, for a total effective sentence of sixteen years' incarceration.

S/ *ROBERT W. WEDEMEYER*_____
ROBERT W. WEDEMEYER, JUDGE

12